*This opinion is subject to revision before final*
*publication in the Pacific Reporter*

**2025 UT 5**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

NATALIE R., a minor, by and through her guardian,
DANIELLE ROUSSEL, et al.,*
*Appellants,*

*v.*

STATE OF UTAH, et al.,*
*Appellees.*

No. 20230022
Heard September 4, 2024
Filed March 20, 2025

On Direct Appeal

Third District Court, Salt Lake County
The Honorable Robert P. Faust
No. 220901658

---

\* Additional appellants: Sedona M., a minor, by and through her guardian, Creed Murdock; Otis W., a minor, by and through his guardian, Paul Wickelson; Lydia M., a minor, by and through her guardian, Heather May; Lola Maldonado; Emi S., a minor, by and through her guardian, David Garbett; Dallin R., a minor, by and through his guardian, Kyle Rima.

Additional appellees: Spencer Cox, Governor of the State of Utah, in his official capacity; the Department of Natural Resources; the Office of Energy Development; Thom Carter, State Energy Advisor and Executive Director of the Office of Energy Development, in his official capacity; the Board of Oil, Gas, and Mining; the Division of Oil, Gas, and Mining; and John R. Baza, Director of the Division of Oil, Gas, and Mining, in his official capacity.

Attorneys*:

Andrew G. Deiss, John Robinson Jr., Corey D. Riley,
Salt Lake City, Andrew L. Welle, Eugene, Or., for appellants

Derek E. Brown, Att'y Gen., Erin T. Middleton, Asst. Solic. Gen.,
David N. Wolf, Michael Begley, Trevor Gruwell, Asst. Att'ys Gen.,
Jeffrey B. Teichert, Salt Lake City, for appellees

---

JUSTICE HAGEN authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, JUSTICE PETERSEN, JUSTICE POHLMAN, and
JUDGE HARRIS joined.

Having recused himself, ASSOCIATE CHIEF JUSTICE PEARCE does not
participate herein; COURT OF APPEALS JUDGE RYAN M. HARRIS sat.

---

JUSTICE HAGEN, opinion of the Court:

## INTRODUCTION

¶1    Several young Utahns brought this lawsuit challenging statutory provisions and government conduct relating to fossil fuel development. The youth plaintiffs allege that the challenged provisions and conduct are designed to maximize fossil fuel development in Utah, which endangers their health and shortens their lifespans by exacerbating the effects of climate change. Based on this harm, the youth plaintiffs asked the district court to declare that the provisions and conduct violate their rights under the Utah Constitution.

¶2    In response to the lawsuit, the government defendants moved to dismiss the case, arguing in part that the requested relief

---

Additional attorneys: Jonathan G. Jemming, Catherine E. Lilly, Salt Lake City, for *amicus curiae* Utah Chapter–American Academy of Pediatrics, Utah Physicians for a Healthy Environment, Utah Moms for Clean Air, Voices for Utah Children, in support of appellants; John Mejia, Salt Lake City, Robert A. Skinner, Sara E. Berinhout, Andrew B. Cashmore, Nicole S. L. Pobre, Boston, Mass., for *amicus curiae* American Civil Liberties of Utah and American Civil Liberties Union, in support of appellants; Jeffrey W. Appel, Stephanie E. Hanawalt, Salt Lake City, Eric Laschever, Mercer Island, Wash., for *amicus curiae* Law Professors, in support of appellants.

would not redress the alleged injuries. The district court agreed and dismissed the claims with prejudice.

¶3   We affirm on the ground that the district court does not have subject-matter jurisdiction.

¶4   First, the youth plaintiffs may not proceed with their challenges to the statutory provisions. One of their challenges is now moot because the legislature has significantly changed the statute since the complaint was filed. And they lack standing to challenge the remaining statutory provisions because success on those challenges would not provide relief that is likely to redress their injuries. The challenged provisions do not—as the youth plaintiffs claim—limit the government defendants' discretion in making decisions about fossil fuel development. Thus, even accepting as true the allegation that less fossil fuel development will ameliorate the adverse health effects of climate change, we can only speculate that striking these specific provisions would lead to less fossil fuel development in this state. The youth plaintiffs try to address this deficiency by asking the court to instruct the government defendants on how they must act "going forward," but such instruction would amount to an impermissible advisory opinion.

¶5   Second, the challenges to the government defendants' conduct are not justiciable because they are not supported by a concrete set of facts. The youth plaintiffs identify general categories of conduct without tying their claims to any specific government actions.

¶6   When a district court does not have subject-matter jurisdiction over a claim, ordinarily the proper course is for the court to dismiss the claim without prejudice. Because we hold that the district court here does not have subject-matter jurisdiction, we instruct the district court to modify its ruling to reflect that the dismissal is without prejudice.

## BACKGROUND[1]

¶7   Seven Utahns, ranging in age from nine to eighteen years old, filed the declaratory judgment action that led to this appeal,

---

[1] When, as here, a defendant argues "that the allegations currently included in the complaint are insufficient to establish jurisdiction," the jurisdictional challenge is a "facial" challenge. *Salt*

(continued . . .)

naming as defendants government entities and officials that oversee fossil fuel development in Utah.[2] In their complaint, the youth plaintiffs explain the scientific link between fossil fuel development and climate change. They also detail the harms they endure due to climate change—including harms to their physical and mental health—and allege that these harms stem from state action promoting the use of fossil fuels. The youth plaintiffs' legal claims fall into two categories: challenges to statutory provisions and challenges to government conduct.

¶8 With respect to the statutory challenges, the youth plaintiffs identify five excerpts from the Utah Code that they claim constitute Utah's fossil fuel development policy. Although these provisions are scattered throughout three chapters of the Utah Code, the youth plaintiffs do not seek to invalidate the relevant acts in their entireties; they challenge only the five "select provisions" they identify. Each of the five provisions, they allege, "mandates or directs" the government defendants "to administer state programs in a manner to maximize, promote, and systematically authorize" fossil fuel development in Utah.

¶9 First, the youth plaintiffs challenge a portion of a single subsection from the section of the Utah Energy Act that describes Utah's energy policy. *See* UTAH CODE § 79-6-301. At the time the complaint was filed, the challenged subsection provided, "Utah will promote the development of . . . nonrenewable energy resources, including natural gas, coal, oil, oil shale, and oil sands." *Id.* § 79-6-301(1)(b)(i) (2022). But after the district court issued its decision dismissing the youth plaintiffs' claims, the legislature substantively amended the energy policy statute. *See* State Energy Policy Amendments, H.B. 374 § 2, 2024 Leg., Gen. Sess. (Utah 2024) (availableathttps://le.utah.gov/~2024/bills/static/HB0374.html). The youth plaintiffs argue that the statutory changes are "immaterial" because the new statute contains a provision similar to the one challenged in their complaint. Specifically, the new

_____

*Lake Cnty. v. State*, 2020 UT 27, ¶ 26, 466 P.3d 158 (contrasting "facial" and "factual" attacks on subject-matter jurisdiction under rule 12(b)(1)). For these challenges, courts presume all jurisdictional facts "to be true." *Id.* (cleaned up). We recite the facts accordingly.

[2] All but one of the plaintiffs are minors appearing through their guardians.

statute provides, "Utah shall promote the development of a diverse energy portfolio, including . . . dispatchable energy resources, including natural gas, coal, oil, and hydroelectric." UTAH CODE § 79-6-301(1)(b)(ii)(A) (2025).

¶10 Second, the youth plaintiffs challenge a snippet from one of four legislative findings about coal mining, located in the Coal Mining and Reclamation Act. *See id.* § 40-10-1. The challenged finding provides that "it is . . . essential to the national interest to insure the existence of an expanding and economically healthy underground coal mining industry." *Id.* § 40-10-1(1).

¶11 Third, the youth plaintiffs challenge one of roughly two dozen "[g]eneral performance standards" that apply to surface coal mining and reclamation operations. *See id.* § 40-10-17(2). The challenged standard states that "all surface coal mining and reclamation operations . . . shall . . . [c]onduct surface coal mining operations so as to maximize the utilization and conservation of the solid fuel resource being recovered so that reaffecting the land in the future through surface coal mining can be minimized." *Id.* § 40-10-17(2)(a).

¶12 Fourth, the youth plaintiffs challenge part of the "[d]eclaration of public interest" found in the Oil and Gas Conservation Act, which reads:

> It is declared to be in the public interest to foster, encourage, and promote the development, production, and utilization of natural resources of oil and gas in the state of Utah in such a manner as will prevent waste; to authorize and to provide for the operation and development of oil and gas properties in such a manner that a greater ultimate recovery of oil and gas may be obtained . . . .

*Id.* § 40-6-1.

¶13 Fifth and finally, the youth plaintiffs challenge the rule of construction found in the Oil and Gas Conservation Act, under which the act

> shall never be construed to require, permit or authorize the board or any court to make, enter or enforce any order, rule, regulation, or judgment requiring restriction of production of any pool or of any well . . . to an amount less than the well or pool can produce unless such restriction is necessary to

prevent waste and protect correlative rights, or the operation of a well without sufficient oil or gas production to cover current operating costs and provide a reasonable return, without regard to original drilling costs.

*Id.* § 40-6-13.

¶14  In addition to these challenges to statutory provisions, the youth plaintiffs challenge government "conduct" related to fossil fuel development, alleging that the government defendants "engage in an ongoing pattern and practice of maximizing, promoting, and systematically authorizing the development of fossil fuels." For support, the youth plaintiffs describe, in broad terms, various types of actions in which the government defendants participate relative to fossil fuel development:

- The Governor develops "goals and objectives" for energy and mineral development, as well as "comprehensive plans" for fossil fuel development.

- The Office of Energy Development (OED) creates "energy plans," "promotes energy and mineral development workforce initiatives," "supports research initiatives," and administers state fossil fuel energy programs.

- The Energy Advisor "advocates . . . for energy-related infrastructure projects," "coordinates . . . energy-related regulatory processes," and recommends "energy-related executive or legislative actions."

- The State and OED coordinate to support legal challenges to programs and initiatives that would reduce fossil fuel development.

¶15 The youth plaintiffs contend that their claims implicate two fundamental rights protected by article I, sections 1 and 7 of the Utah Constitution: the right "to life" and the right "to liberty."[3]

_____

[3] Article I, section 1 provides:

All persons have the inherent and inalienable right to enjoy and defend their lives and liberties; to acquire, possess and protect property; to worship according to the dictates of their consciences; to assemble peaceably, protest against wrongs, and petition for

(continued . . .)

In their first cause of action, the youth plaintiffs allege that the government defendants' promotion of fossil fuel development infringes on their right to life by "substantially reducing their lifespans and the number of healthy years in their lives." In their second cause of action, they allege that the right to liberty includes a right "to be free from government conduct that substantially endangers their health and safety" and that the government defendants' fossil fuel policies infringe on that right. And they allege that the challenged provisions and conduct are not narrowly tailored to achieve a compelling government interest.

¶16 Based on these claims, the youth plaintiffs seek a declaratory judgment that the statutory provisions and government conduct are unconstitutional. The youth plaintiffs envision a declaration that would not only "invalidate the statutory provisions" but also "instruct" the government defendants that their ongoing conduct "is constitutionally impermissible." The desired declaration would thus force the government defendants to "align their conduct with the Court's ruling," ushering an "end" to the "ongoing pattern and practice of maximizing, promoting, and systematically authorizing fossil fuel production and development" in Utah.

¶17 The government defendants moved to dismiss the complaint under rules 12(b)(1) and 12(b)(6) of the Utah Rules of Civil Procedure. *See* UTAH R. CIV. P. 12(b)(1) (allowing motion to dismiss for lack of subject-matter jurisdiction); *id.* R. 12(b)(6) (allowing motion to dismiss for "failure to state a claim upon which relief can be granted"). As relevant here, they argued that because the challenged statutory provisions are nonoperative "policy explanations," the court declaring them unconstitutional would be a mere "symbolic action" unlikely to redress the youth plaintiffs'

---

redress of grievances; to communicate freely their thoughts and opinions, being responsible for the abuse of that right.

UTAH CONST. art. I, § 1. And article I, section 7 provides, "No person shall be deprived of life, liberty or property, without due process of law." *Id.* art. I, § 7.

injuries. In other words, they asserted that the youth plaintiffs do not meet the redressability requirement for traditional standing.[4]

¶18 The district court agreed with the government defendants and granted the motion to dismiss. With respect to subject-matter jurisdiction, the court ruled that the youth plaintiffs lacked standing because their claims were not redressable.[5] Noting that "all operative provisions" of the relevant statutes "would survive the requested relief," the court explained that the youth plaintiffs had not shown that the relief they requested would "have any effect on carbon emissions in Utah." Despite having concluded that subject-matter jurisdiction was lacking, the court proceeded to address the merits of the claims and ultimately dismissed the complaint with prejudice.

¶19 The youth plaintiffs appealed, and we exercise jurisdiction under Utah Code section 78A-3-102(3)(j).

## ISSUE AND STANDARD OF REVIEW

¶20 The youth plaintiffs ask that we review the district court's dismissal of their claims. This "presents a question of law that we review for correctness." *Haik v. Jones*, 2018 UT 39, ¶ 9, 427 P.3d 1155.

## ANALYSIS

¶21 The district court reviewed and dismissed the youth plaintiffs' claims for "lack of jurisdiction over the subject matter," *see* UTAH R. CIV. P. 12(b)(1), and for "failure to state a claim upon which relief can be granted," *see id.* R. 12(b)(6). But where jurisdiction is lacking, "the court has authority to opine only on the law and facts surrounding its own power." *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*, 2012 UT 66, ¶¶ 24–25, 289 P.3d 502. Because we conclude that the district court lacks subject-matter jurisdiction, we affirm the dismissal of the complaint under rule 12(b)(1).

¶22 Subject-matter jurisdiction comes in at least two stripes. *See Granite Sch. Dist. v. Young*, 2023 UT 21, ¶¶ 25–27, 537 P.3d 225.

---

[4] "Simply put, traditional standing requires a claimant to show injury, causation, and redressability." *Erda Cmty. Ass'n v. Grantsville City*, 2024 UT App 126, ¶ 23, 558 P.3d 91.

[5] The district court also determined that the claims were not justiciable under the political question doctrine. Because we affirm on other grounds, it is unnecessary for us to reach that question.

The first "involves whether the court has statutory authority to hear a particular class of cases. A justice court, for example, lacks jurisdiction to hear a felony case." *Id.* ¶ 26 (cleaned up). The second "embodies concepts of justiciability." *Id.* ¶ 27. And justiciability, in turn, "implicates various categories of cases and doctrines that impose limits on our jurisdiction, including advisory opinions, feigned and collusive cases, standing, ripeness, mootness, political questions, and administrative questions." *Carlton v. Brown*, 2014 UT 6, ¶ 30, 323 P.3d 571.

¶23 Our decision in this case rests on the second category of subject-matter jurisdiction—the category under which "the courts are without jurisdiction" absent "any justiciable controversy between adverse parties." *Williams v. Univ. of Utah*, 626 P.2d 500, 503 (Utah 1981). Declaratory judgment actions must have "the justiciable and jurisdictional elements requisite in ordinary actions." *Salt Lake Cnty. v. Bangerter*, 928 P.2d 384, 385 (Utah 1996) (cleaned up). Our cases establish four requirements for declaratory judgment actions: "(1) there must be a justiciable controversy; (2) the interests of the parties must be adverse; (3) the parties seeking relief must have a legally protectible interest in the controversy; and (4) the issues between the parties must be ripe for judicial determination." *Jenkins v. Swan*, 675 P.2d 1145, 1148 (Utah 1983) (cleaned up); *see also, e.g.*, *Bleazard v. City of Erda*, 2024 UT 17, ¶ 40, 552 P.3d 183. Nested within the second and third requirements are the traditional standing requirements—injury, causation, and redressability. *Jenkins*, 675 P.2d at 1148; *see also Summit Cnty. v. Town of Hideout*, 2024 UT 39, ¶ 33, 557 P.3d 574 ("[P]arties may bring actions under the Declaratory Judgment Act only if they can show that the justiciable and jurisdictional elements requisite in ordinary actions—*including standing*—are present." (cleaned up) (emphasis added)); *S. Utah Wilderness All. v. San Juan Cnty. Comm'n*, 2021 UT 6, ¶ 14, 484 P.3d 1160 (describing "our three-part test" for traditional standing).

¶24 We conclude that the district court does not have subject-matter jurisdiction over any of the youth plaintiffs' claims, though the jurisdictional deficiency varies depending on the nature of the claim. First, their challenge to the energy policy provision is moot because the legislature recently rehauled the statute, including the provision at issue. Second, the youth plaintiffs lack standing to challenge the remaining provisions for two reasons: striking the provisions as unconstitutional would not redress their injuries, and providing guidance on the "constitutional parameters" at play

would amount to an advisory opinion. Finally, the challenges to the government defendants' conduct are not justiciable because they are not tied to any specific government actions.

I.  THE DISTRICT COURT LACKS SUBJECT-MATTER JURISDICTION OVER THE YOUTH PLAINTIFFS' CHALLENGES TO THE STATUTORY PROVISIONS

   A. *The Challenge to the Energy Policy Provision Is Moot Because the Provision No Longer Exists in Its Challenged Form*

¶25  The youth plaintiffs challenge a provision of the energy policy statute that—when the complaint was filed—provided, "Utah will promote the development of . . . nonrenewable energy resources, including natural gas, coal, oil, oil shale, and oil sands." UTAH CODE § 79-6-301(1)(b)(i) (2022). But the legislature removed this language in 2024, when it amended the energy policy statute. *See* State Energy Policy Amendments, H.B. 374 § 2, 2024 Leg., Gen. Sess. (Utah 2024) (available at https://le.utah.gov /~2024/bills/static/HB0374.html). That legislative amendment creates a problem for the youth plaintiffs, whose challenge now relies on defunct language. We conclude that the statutory amendments make the challenge, as pleaded, moot.

¶26 An issue is moot if the requested relief becomes "impossible or of no legal effect." *Grewal v. Junction Mkt. Fairview, L.C.*, 2024 UT 20, ¶ 19, 554 P.3d 863 (cleaned up). One way this can happen is if "the practical or legal relationship between the parties" changes, such as through the "repeal or amendment of the law under review." *Salt Lake City Corp. v. Utah Inland Port Auth.*, 2022 UT 27, ¶ 21, 524 P.3d 573. That is what happened here: the legislature's amendment of the energy policy statute rendered the requested relief—a declaration that the now-repealed challenged language is unconstitutional—legally ineffective.

¶27  Even if the district court declared the outdated language unconstitutional, that declaration would have no effect on the validity of the current statute. The youth plaintiffs' complaint identifies language from the 2022 version of the energy policy provision, which they interpret to be a "mandate[]" under which the government defendants must "maximize, promote, and systematically authorize" fossil fuel development. But the current version does not impose any such mandate; it expresses a policy of promoting "the development of a diverse energy portfolio." UTAH CODE § 79-6-301(1)(b)(ii) (2025). Given the discrepancy between the

10

challenge as it was pleaded and the law as it stands, the court can no longer "order a remedy that will have a meaningful impact on the practical positions of the parties." *See Salt Lake City Corp.*, 2022 UT 27, ¶ 21 (cleaned up).

¶28 And the legislative changes are not "immaterial," as the youth plaintiffs claim, simply because the energy policy statute still mentions natural gas, coal, and oil. As mentioned, the statute now endorses promoting "a diverse energy portfolio" — an endorsement that was previously absent. *Compare* UTAH CODE § 79-6-301 (2022), *with id.* (2025). That diverse energy portfolio includes "clean energy sources," assessing "the environmental impact, including emissions, of an energy resource throughout the entire life cycle of the energy resource." *Id.* § 79-6-301(b)(ii)(D) (2025). Those considerations were not mentioned in the prior statute. *See generally id.* § 79-6-301 (2022). Further, in its 2024 amendment, the legislature created a new state policy of developing energy resources and planning an energy future "with a focus on human well-being and quality of life." *Id.* § 79-6-301(1)(a)(i) (2025). These changes are material to the youth plaintiffs' legal challenge and render that challenge moot as it is currently pleaded in the complaint.

*B. The Youth Plaintiffs Do Not Have Standing to Challenge the Remaining Statutory Provisions Because Declaring Those Provisions Unconstitutional Is Not Substantially Likely to Redress the Alleged Injuries*

¶29 The youth plaintiffs contend that a favorable court judgment would "invalidate . . . unconstitutional statutory directives, removing the mandates under which" the government defendants are harming them through unrestrained fossil fuel development. Although we agree that a favorable judgment would invalidate the challenged provisions, we disagree with the premise that the challenged provisions impose "directives" or "mandates" on the government defendants. In context, the provisions are part of larger statutory schemes under which the government defendants have leeway in making decisions concerning fossil fuel development.

¶30 As in other types of actions, plaintiffs in declaratory judgment actions must establish standing. *Jenkins v. Swan*, 675 P.2d 1145, 1148 (Utah 1983); *see also Summit Cnty. v. Town of Hideout*, 2024 UT 39, ¶ 33, 557 P.3d 574. And plaintiffs cannot establish standing unless the requested relief is "substantially likely to redress the injury claimed." *Jenkins*, 675 P.2d at 1150. When, as here, a plaintiff

asks the court to declare statutory provisions unconstitutional, the court must determine whether "the adverse impact on [the plaintiff] will be relieved." *Id.* at 1153. At the motion-to-dismiss stage, a plaintiff's claims are redressable if, assuming the plaintiff "prevails on the merits of its claims, the district court could redress, at least in part, the harm [the plaintiff] suffered." *S. Utah Wilderness All. v. Kane Cnty. Comm'n*, 2021 UT 7, ¶ 34, 484 P.3d 1146.

¶31 Here, the youth plaintiffs maintain that if the court were to declare the challenged statutory provisions unconstitutional, it would reduce fossil fuel development in Utah and thus partially redress the harms they have alleged. For purposes of the motion to dismiss, we accept as true that reducing fossil fuel development would slow climate change and thereby reduce its adverse health impact on the youth plaintiffs. Even so, we conclude, as a legal matter, that declaring the challenged provisions unconstitutional would not limit the government defendants' ability to promote fossil fuel development and therefore is not substantially likely to produce the desired effect of redressing their injuries in whole or in part.

¶32 To determine whether declaring the challenged provisions unconstitutional would reduce fossil fuel development in Utah, we must look at the provisions not "in isolation," but in "the relevant context." *See McKitrick v. Gibson*, 2021 UT 48, ¶ 19, 496 P.3d 147 (cleaned up). So viewed, the provisions do not—individually or collectively—"mandate and direct" the government defendants "to administer state programs in a manner to maximize, promote, and systematically authorize fossil fuel development." Rather, the relevant statutes allow the government defendants to consider various factors in their decision-making. We address each of the four remaining challenged provisions in turn.

### 1. Legislative Finding on Coal Mining

¶33 The youth plaintiffs target a legislative finding on coal mining, which they claim "directs" the government defendants "in their conduct with respect to coal mining operations to 'insure the existence of an expanding and economically healthy' coal mining industry." (Quoting UTAH CODE § 40-10-1(1).) The youth plaintiffs accurately quote a portion of a legislative finding on coal mining, which provides in full:

> The Utah Legislature finds that . . . [c]oal mining operations presently contribute significantly to the nation's energy requirements; surface coal mining

constitutes one method of extraction of the resource; the overwhelming percentage of Utah's coal reserves can only be extracted by underground mining methods; and it is, therefore, essential to the national interest to insure the existence of an expanding and economically healthy underground coal mining industry.

UTAH CODE § 40-10-1(1).

¶34 But, properly understood, this finding does not "direct" the government defendants to do (or not do) anything "in their conduct with respect to coal mining operations." Instead, it merely evinces a legislative belief from 1979 about the United States' interest in a healthy underground coal mining industry. This understanding is reinforced by the unchallenged legislative findings that follow. Among those counterbalancing findings, for example, is a statement about the "urgent" need for "appropriate standards to minimize damage to the environment and to productivity of the soil and to protect the health and safety of the public." *Id.* § 40-10-1(2).

¶35 At bottom, the challenged finding leaves the government defendants with discretion in overseeing state coal mining operations; it does not compel or prohibit any particular action related to coal mining. As such, its removal from the Coal Mining and Reclamation Act is not substantially likely to result in less coal mining in the state.

### 2. Coal Mining Performance Standard

¶36 The youth plaintiffs identify another statutory provision that, in their view, "mandates that in exercising authority over the permitting of coal mining," the government defendants "'shall require' all 'coal mining operations' to maximize coal extraction." (Quoting *id.* § 40-10-17(2)(a).) The provision imposes a "performance standard[]" for all approved surface coal mining operations, requiring those operations to be conducted "so as to maximize the utilization and conservation of the solid fuel resource being recovered so that reaffecting the land in the future through surface coal mining can be minimized." *Id.* § 40-10-17(2)(a). But this performance standard comes into play only after a coal mining operation receives a permit; it does not dictate whether a permit application must be approved or denied in the first instance. *See id.* § 40-10-17(1)–(2). If the government defendants were to decide that, due to the threat of climate change, it would be in the public's best

interest to phase out coal mining in the state by denying all new coal-mine-operation permit applications, the challenged performance standard would not stand in their way.

¶37 And even without the challenged performance standard, a permitted coal mining operation would not be prohibited from "maximiz[ing] the utilization and conservation of the solid fuel resource being recovered." *Id.* § 40-10-17(2)(a). Stated differently, striking the challenged performance standard would not impose a new performance standard requiring coal operations to recover less than the maximum amount of a resource.

¶38 Therefore, declaring the challenged performance standard unconstitutional is not substantially likely to reduce coal mining in the state, as the government defendants would still have the same permit-granting discretion, and permit holders could conduct their operations in the same way without the standard.

### 3. Declaration of Public Interest

¶39 Next, the youth plaintiffs challenge part of the declaration of public interest in the Oil and Gas Conservation Act, which they contend is a "statutory directive" that binds the government defendants "in the exercise of their authority." The relevant language declares that it is

> in the public interest to foster, encourage, and promote the development, production, and utilization of natural resources of oil and gas in the state of Utah in such a manner as will prevent waste; to authorize and to provide for the operation and development of oil and gas properties in such a manner that a greater ultimate recovery of oil and gas may be obtained and that the correlative rights of all owners may be fully protected.

*Id.* § 40-6-1.

¶40 The government defendants respond that this declaration of public interest is more "guidance" than "directive." But the youth plaintiffs resist this interpretation, arguing that we said otherwise in *Bennion v. ANR Production Co.*, 819 P.2d 343 (Utah 1991). The youth plaintiffs have something of a point. In *Bennion*, we considered whether an order from the Utah State Board of Oil, Gas, and Mining contravened the declaration of public interest. *See id.* at 346. And in describing the plaintiff's argument, we did—as

14

the youth plaintiffs here highlight—refer to the declaration of public interest as a "statutory directive." *Id.*

¶41 Regardless of whether the declaration of public interest is best characterized as guidance or directive, however, fossil fuel development in Utah would not change in any way if the provision were declared unconstitutional. In the absence of the challenged language, the government defendants would not be obliged to carry out the operative provisions of the Oil and Gas Conservation Act differently. The challenged language does not, for example, require the government defendants to authorize a particular oil well, nor does it dictate the criteria used to review permit applications. For this reason, we cannot say that striking the challenged language is substantially likely to redress the youth plaintiffs' injuries.

### 4. Rule of Construction

¶42 We reach the same conclusion as to the final challenged statutory provision, under which the Oil and Gas Act

> shall never be construed to require, permit or authorize the board or any court to make, enter or enforce any order, rule, regulation, or judgment requiring restriction of production of any pool or of any well (except a well drilled in violation of Section 40-6-6 hereof) to an amount less than the well or pool can produce unless such restriction is necessary to prevent waste and protect correlative rights, or the operation of a well without sufficient oil or gas production to cover current operating costs and provide a reasonable return, without regard to original drilling costs.

UTAH CODE § 40-6-13.

¶43 As with the challenged performance standard provision, *see supra* ¶ 36–38, this rule of construction does not require the government defendants to authorize or deny permit applications in the first instance. Nor does it require the government defendants to insist that permitholders act or refrain from acting in any specific way. Thus, we conclude that it is not substantially likely that the youth plaintiffs' injuries would be relieved if the court were to declare the rule of construction unconstitutional.

¶44 In sum, the youth plaintiffs' challenges to the statutory provisions all share the same defect: they are not redressable

because declaring the provisions unconstitutional would not require the government defendants to curb fossil fuel development in Utah. As a result, the requested relief is not substantially likely to redress the youth plaintiffs' injuries, even in part. Because the youth plaintiffs do not have standing, we affirm the dismissal of their statutory challenges for lack of subject-matter jurisdiction.[6]

C. *The Youth Plaintiffs' Desired Declaration Would Be an Advisory Opinion*

¶45 The youth plaintiffs assert that their challenges to the statutory provisions ought to move forward even if we conclude that striking the provisions would not redress their injuries. They ask the court for "guidance as to the constitutional parameters governing" the government defendants' "subsequent conduct."

---

[6] The youth plaintiffs have alerted us to a Montana Supreme Court decision that was issued after we heard oral argument in this case. *See Held v. State*, 560 P.3d 1235 (Mont. 2024). There, the Montana Supreme Court affirmed the district court's ruling that a limitation found in the Montana Environmental Policy Act (MEPA limitation) violates the Montana Constitution, *id.* at 1261, which—unlike the Utah Constitution—expressly endows Montanans with a fundamental right to a "clean and healthful environment," MONT. CONST. art. II, § 3; *id.* art. IX, § 1(1). Under the MEPA limitation, environmental reviews could not, "except for narrowly defined exceptions, . . . include an evaluation of greenhouse gas emissions and corresponding impacts to the climate in the state or beyond the state's borders." *Held*, 560 P.3d at 1244 (cleaned up). The limitation was a categorical, "blanket prohibition," banning governmental consideration of climate change in the environmental review process. *Id.* at 1258.

In contrast, the provisions that the youth plaintiffs challenge here do not prohibit the government defendants from considering climate change or otherwise limit their discretion in a manner that is likely to impact fossil fuel development. To the contrary, the relevant statutes give the government defendants broad latitude in carrying out their duties and expressly contemplate that state officials will consider "the environmental impact" and the effect on "human well-being and quality of life" in exercising that discretion. UTAH CODE § 79-6-301(1)(a)(i), (b)(ii)(D) (2025). Thus, declaring the provisions unconstitutional would not require the government defendants to change their decision-making process in a way that is likely to reduce fossil fuel development.

But this request does not revive their challenges to the statutory provisions; it merely substitutes a redressability problem with an advisory-opinion problem.

¶46 Courts "are not supposed to be a forum for hearing academic contentions or rendering advisory opinions." *Lyon v. Bateman*, 228 P.2d 818, 820 (Utah 1951). This principle applies equally to claims brought under the Declaratory Judgment Act. *Baird v. State*, 574 P.2d 713, 716 (Utah 1978) (explaining that in adjudicating a "declaratory action," a court may not "pass upon the constitutionality of [a] statute" where the plaintiff seeks "an advisory opinion" or presents "a non-justiciable controversy"). The Declaratory Judgment Act "cannot be so construed as to authorize the courts to deliver advisory opinions or pronounce judgments on abstract questions." *Id.* Instead, "there must be the invariable justiciable controversy present in such cases." *Id.*

¶47 By definition, a justiciable controversy cannot be resolved through an advisory opinion, for a justiciable controversy is "one that is appropriate for judicial determination . . . as distinct from an opinion or advice of what the law would be on a hypothetical state of facts." *Lyon*, 228 P.2d at 821 (cleaned up). In recognition of this distinction, "our case law has firmly established that courts should not render advisory opinions, or, in other words, answer abstract questions"—which are questions that are "to be considered apart from application to or association with a particular instance." *Salt Lake Cnty. v. State*, 2020 UT 27, ¶¶ 38, 47, 466 P.3d 158 (cleaned up). This means, in short, that a court must dismiss claims that "are better characterized as requests for advisory opinions regarding the constitutionality of" a challenged statute. *Id.* ¶ 47.

¶48 By asking the court for judicial guidance about the constitutionality of the government defendants' subsequent conduct, the youth plaintiffs ask the court to look past the concrete question of whether the challenged statutory provisions are constitutional and instead to pronounce judgment on the hypothetical question of whether the government defendants' future actions would be so. This we cannot do because answering such a hypothetical question would require the court to divorce the question from the facts. Because future conduct is necessarily hypothetical, the youth plaintiffs' request is better characterized as a request for an advisory opinion. The district court is therefore without subject-matter jurisdiction to opine on the question that the youth plaintiffs want it to answer.

II. THE DISTRICT COURT DOES NOT HAVE SUBJECT-MATTER JURISDICTION OVER THE YOUTH PLAINTIFFS' CHALLENGES TO THE GOVERNMENT DEFENDANTS' CONDUCT BECAUSE THE CLAIMS ARE NOT TIED TO ANY SPECIFIC STATE ACTION

¶49 The youth plaintiffs' challenges to the government defendants' conduct fail for a different reason. Before a Utah court can hear a declaratory judgment action, "there must be a justiciable controversy." *Jenkins v. Swan*, 675 P.2d 1145, 1148 (Utah 1983) (cleaned up). In challenging the government defendants' conduct, the youth plaintiffs do not allege a concrete set of facts that would give rise to a justiciable controversy. Without a justiciable controversy, the district court lacks subject-matter jurisdiction over those challenges.

¶50  For a controversy to be justiciable, it "must be definite and concrete, touching the legal relation of the parties in adverse legal interest, and must be a real and substantial controversy admitting of specific relief through a decree conclusive in character." *Lyon v. Bateman*, 228 P.2d 818, 821 (Utah 1951) (cleaned up). A controversy is not justiciable, then, if the parties hold merely "a difference or dispute of hypothetical or abstract character." *Id.* (cleaned up). Nor is a controversy justiciable if the "resulting legal rule" cannot "be applied to a specific set of facts, thereby resolving a specific controversy." *Salt Lake Cnty. v. State*, 2020 UT 27, ¶ 2, 466 P.3d 158; *see also Salt Lake Cnty. v. Bangerter*, 928 P.2d 384, 385 (Utah 1996) ("[O]ur hands are tied because a justiciable controversy necessarily involves an accrued state of facts . . . ." (cleaned up)).

¶51 This means that "to plead a justiciable controversy, plaintiffs must plead concrete facts indicating a specific injury sustained or threatened to the plaintiffs." *Salt Lake Cnty.*, 2020 UT 27, ¶ 42 (cleaned up). This concreteness requirement makes sense, given that "courts are most competent in the exercise of their function when they have a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Jenkins*, 675 P.2d at 1149 (cleaned up). The doctrine serves a number of important functions, including "blocking the court from rendering advisory opinions on matters that may not impact the parties to a case, requiring a clear factual record prior to adjudication, facilitating informed decisions that fit the circumstances of individual cases, and preventing the court from intruding on legislative functions by unnecessarily ruling on

sensitive constitutional questions."[7] *Salt Lake Cnty.*, 2020 UT 27, ¶ 18 (cleaned up).

¶52 Applied here, these principles strip the district court of subject-matter jurisdiction to rule on the youth plaintiffs' challenges to the government defendants' conduct. The youth plaintiffs allege broadly that (1) the Governor develops goals, objectives, and plans; (2) OED oversees plans, initiatives, and programs; (3) the Energy Advisor advocates for projects, coordinates regulatory processes, and recommends executive and legislative actions; and (4) the State and OED coordinate to challenge programs and initiatives that would reduce fossil fuel development. But the challenges to the government defendants' conduct are insufficiently concrete for the district court to make an informed decision that fits the circumstances of the case or to appreciate the consequences that would flow from the requested relief. The youth plaintiffs have not challenged the constitutionality of any specific state action, such as a granted permit or other regulatory decision. As a result, the district court cannot apply the law to a set of facts to determine whether such action is unconstitutional.

¶53 To be sure, the youth plaintiffs are not vague in describing the total effect of the government defendants' actions. As to Utah's historical output of oil, natural gas, and coal, the youth plaintiffs are quite specific, in fact. They allege that from 1960 to 2021, government-sanctioned operations generated approximately

- 1,709,140,620 barrels of crude oil,
- 14,386,078,152,000 cubic feet of natural gas, and
- 931,247,641 short tons of coal.

And fossil fuel production in Utah is speeding up, not slowing down, according to the youth plaintiffs. They allege that annual oil production in Utah has more than doubled since 2003, that annual natural-gas production has nearly quadrupled since 1960, and that annual coal production has roughly tripled since 1960.

---

[7] Although we have listed these policy considerations as those underlying the ripeness doctrine, *see Salt Lake Cnty. v. State*, 2020 UT 27, ¶ 18, 466 P.3d 158, "the policies underlying the ripeness doctrine also underlie the advisory opinion rule," *id.* ¶ 18 n.13.

¶54  We do not discount these production estimates as being vague, of course. Indeed, as with the link between adverse health effects and climate change, we accept them as true. *See supra* ¶ 31. But specific allegations about the cumulative result of Utah's fossil fuel operations do not make up for nondescript allegations about the unconstitutional actions taken by the government defendants.

¶55  The youth plaintiffs maintain that they have brought a facial challenge that does not require them to connect their claims to any "particular circumstances." They support this position by referencing *Held v. State*, 560 P.3d 1235 (Mont. 2024), in which the Montana Supreme Court held that the plaintiffs did not need to identify "a specific permit" to challenge a statutory provision under which environmental reviews could not, "except for narrowly defined exceptions, . . . include an evaluation of greenhouse gas emissions and corresponding impacts to the climate in the state or beyond the state's borders." *Id.* at 1244, 1255–56 (cleaned up). The court explained that such specificity would be required for an "'as applied' constitutional challenge," but was unnecessary for a facial challenge. *Id.* at 1255–56. Because the plaintiffs had "alleged the statute was facially unconstitutional—that no set of circumstances exists where the State could prohibit state agencies from analyzing [greenhouse gas] emissions in all permitting actions"—it was not necessary for the plaintiffs to bring their challenge "within the context of a particular permit." *Id.*

¶56  We agree with the youth plaintiffs that their challenges to the statutory provisions are facial challenges, which, by definition, are not tied to any particular circumstances because they require a plaintiff "to establish that no set of circumstances exists under which the statute would be valid." *In re Adoption of K.T.B.*, 2020 UT 51, ¶ 3 n.2, 472 P.3d 843 (cleaned up). As we understand their complaint, however, the youth plaintiffs—unlike the plaintiffs in *Held*—challenge not only statutes, but also government conduct, specifically, the "historic and ongoing systematic authorization of fossil fuel development." Unlike a facial challenge to the constitutionality of a statute, a constitutional challenge to government conduct must be tied to a concrete set of facts. A court cannot declare conduct unconstitutional unless it can define the unconstitutional conduct clearly, and a court cannot define unconstitutional conduct clearly unless the plaintiffs first "frame their constitutional challenges in the context of a specific factual dispute." *Salt Lake Cnty.*, 2020 UT 27, ¶ 42. Without that framing,

the youth plaintiffs' conduct challenges "are merely requests for advisory opinions" and are not justiciable.[8] *See id.*

### III. THE YOUTH PLAINTIFFS' CLAIMS SHOULD BE DISMISSED WITHOUT PREJUDICE

¶57 Having concluded that the district court does not have subject-matter jurisdiction over the youth plaintiffs' claims as pleaded, we now consider whether the claims should be dismissed with or without prejudice. The youth plaintiffs object to the district court's decision to dismiss the claims with prejudice. And the government defendants appear to concede that if we affirm on subject-matter-jurisdiction grounds, the claims should be dismissed without prejudice. We agree.

¶58 When a district court determines that it lacks subject-matter jurisdiction based on a complaint's allegations, it may "direct the plaintiff to amend the pleading," or it may "dismiss without prejudice so that the plaintiff can later file an amended complaint." *Salt Lake Cnty. v. State*, 2020 UT 27, ¶ 27, 466 P.3d 158 (cleaned up). In the proceedings below, the youth plaintiffs did not seek leave to amend their complaint. So once the district court determined that it lacked subject-matter jurisdiction, it should have dismissed the complaint without prejudice, providing the youth plaintiffs an opportunity to cure the jurisdictional deficiencies in a repleaded complaint.

## CONCLUSION

¶59 Because the district court lacks subject-matter jurisdiction, we affirm the dismissal of the complaint under rule 12(b)(1) of the Utah Rules of Civil Procedure. The challenge to the energy policy provision is moot. And the youth plaintiffs lack standing to challenge the remaining statutory provisions because there is no substantial likelihood that declaring the provisions

---

[8] The youth plaintiffs also contend that the district court's decision deprived them of their right to their "day in court" under the Open Courts Clause and the Due Process Clause of the Utah Constitution. (Quoting *Miller v. USAA Cas. Ins. Co.*, 2002 UT 6, ¶ 38, 44 P.3d 663.) But any constitutional right to a day in court cannot extend to claims the court is barred from adjudicating. *See Miller*, 2002 UT 6, ¶ 38 ("Parties to a suit . . . are constitutionally entitled to litigate any *justiciable controversy* between them, i.e., they are entitled to their day in court." (emphasis added)).

unconstitutional would redress the youth plaintiffs' injuries. Although the youth plaintiffs invite a broader declaration outlining the parameters of their asserted rights, the court does not issue such advisory opinions. And the challenges to government conduct are not justiciable because they are not based on a specific set of facts. But because the lack of subject-matter jurisdiction should not have resulted in a dismissal with prejudice, we vacate the order and judgment and remand for the district court to enter a dismissal without prejudice.

———————